UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT    STATE OF NEW YORK
_____

NGOZI OKARO,

                Plaintiff,

      -vs-

CITY UNIVERSITY OF NEW YORK
JOHN JAY COLLEGE, VIVIEN
HOEXTER, DONALD GRAY, and
JAMES SHERIDAN

                Defendants.
_____

**AMENDED COMPLAINT AND JURY TRIAL DEMAND**

**12 CIV 1246 (JGK)**

Plaintiff, NGOZI OKARO (hereinafter "Plaintiff") as and for her Amended Complaint, by her undersigned counsel, alleges against the above-captioned Defendants, the following:

## NATURE OF THE ACTION

This is an action to remedy violations of the Plaintiff's rights under Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. 2000e et seq.; New York State Human State Rights Law, New York Executive Law §296(1)(a); Civil Rights Act of 1866, as codified, 42 U.S.C. §1981; the New York City Human Rights Law, N.Y. City Admin Code §§8-101 – 131 (as applicable) on the basis of race, national origin and gender; breach of contract; and the common law of New York State.

## JURISDICTION AND VENUE

1.    Jurisdiction in this matter is pursuant to 28 U.S.C. §1331, Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. 2000e-5.  The Court's customary pendent jurisdiction of claims arising under New York State Law is also requested.

1

2. Venue for this matter has been properly laid in the Southern District of New York pursuant to 28 U.S.C. §1391.

3. The acts of unlawful employment practices alleged herein including but not limited to discrimination, hostile work environment, retaliation, and breach of contract were committed in whole or in part in the Southern District of the State of New York.

4. Plaintiff resides at 102 Bradhurst Avenue, Apartment 908, New York, County of New York, State of New York.

5. Upon information and belief, Defendant's principal campus and/or place of business is located at 899 Tenth Avenue, New York, State of New York.

6. Plaintiff worked at Defendant's administrative offices/principal campus located at 899 Tenth Avenue, New York, State of New York.

## PARTIES

7. Beginning in January 2010 and at all relevant times hereinafter mentioned, Plaintiff was employed by the Defendant, City University of New York John Jay College (hereinafter the "Defendant" or "John Jay" or the "College") as the Director of Major Gift until she was abruptly and wrongfully terminated from her employment duties without cause on February 25, 2011 by Defendant.

8. At all relevant times described herein, Plaintiff was an "employee" of the Defendant within the meaning of 42 U.S.C. §§2000e et seq. and New York State law.

9. Upon information and belief, Defendant is a domestic educational institution organized, incorporated and existing under the laws of the State of New York

and an "employer" within the meaning of 42 U.S.C. §§2000e et seq. and New York State law.

11. 10. Plaintiff had two supervisors during her tenure of employment to wit: Defendant Vivien Hoexter (hereinafter "Hoexter") employed as the Defendant's Vice President for Marketing and Development; and Defendant James Sheridan ("Sheridan"), the Defendant's Director of Development.

11. Upon information and belief, Sheridan and Hoexter were in charge of recommending the hiring and firing of the Plaintiff, and then the President of the College and Human Resources would approve that recommendation.  Sheridan, Hoexter, the President of the College and the Chair of the John Jay College Foundation interviewed Plaintiff for her position.  In fact, from the very beginning, Hoexter displayed racial animus and inappropriate behavior in Plaintiff's interview for her position with Defendant; Hoexter began using street slang in her conversation with Plaintiff such as, "Linda is good people" when referring to a mutual acquaintance.

12. Upon information and belief, neither Hoexter nor Sheridan is employed with Defendant any longer due to their performance issues.  In addition, however, upon information and belief, both individuals' jobs have been filled and each Director has been replaced with other professionals.

13. Upon information and belief, at all times relevant in this action, Defendant Donald Gray (hereinafter "Gray") was the Director of Human Resources.

14. Upon further information and belief, although still employed with John Jay, Defendant Gray is no longer the Director of Human Resources and sometime after the events set forth herein was transferred into another department of the College.

15. In their capacities as Plaintiff's supervisors, Defendants Hoexter and Sheridan had the power to make personnel decisions regarding Plaintiff's employment and were the proximate cause of the Defendant's disparate, discriminatory and unlawful treatment of Plaintiff during her employment with Defendant John Jay.

16. In his capacity as Director of Human Resources, Defendant Gray was not only aware of the Defendants' mistreatment and discrimination of Plaintiff but, upon information and belief, also aided and abetted the incongruent unlawful conduct described herein.

## FACTUAL ALLEGATIONS

17. Plaintiff is a 42-year-old African-American woman of Nigerian heritage.

18. She is a highly experienced and certified non-profit fundraiser, having worked for institutions including Yale University, the United Nations Association, and the Brooklyn Hospital Center.  Before joining the Defendant, Plaintiff was the Senior Director at CCS Fundraising, one of the best fundraising entities in the United States. And before that, Plaintiff was a practicing attorney having graduated from Georgetown University Law Center in 1997.

19. Plaintiff was appointed as the Director of Major Gifts of the Defendant John Jay College in mid-January 2010 by President Jeremy Travis and charged with starting a major gifts program at the College.  She was interviewed and offered the position by Defendants Hoexter and Sheridan.

20. Plaintiff was only one (1) of four (4) women of African descent (African-American or Hispanic) in this particular department – the Development Office – and the only Director that was black.

4

21. In early January 2010, Plaintiff met with Defendant Sheridan to map out her work plan and goals for the year. Plaintiff was eager to get started and develop a major gift program for the College (which did not have any type of fundraising plan) but also wanted to ensure that her new employer and her supervisors understood that in her considerable experience, "start-up" fundraising programs take at least 18-months or more to get off the ground. In other words, fundraising efforts do not happen overnight.

22. In the early months of Plaintiff's employment in 2010, Defendants Sheridan and Hoexter approved Plaintiff's fundraising plan(s), her yearly goals and agreed that her targets for 2010 (hereinafter the "2010 fundraising plan") would take at least 18-months to come into fruition.

23. When Plaintiff attempted to execute her 2010 fundraising plan right away upon beginning her employment, however, Hoexter and Sheridan thwarted and interfered with her basic ability to do her job by preventing her from contacting alumni, trustees and donors, and then substantially changed her job responsibilities, and otherwise made it impossible for Plaintiff to succeed. Actually quite the opposite; Hoexter and Sheridan set Plaintiff up to fail. The only logical explanation for the Defendants' behavior and treatment of the Plaintiff is that it was a pretext for discrimination.

24. For example, Hoexter began to give Plaintiff secretarial tasks and clerical work such as asking her to type letters, format envelopes and the like, all the while Hoexter had three administrative staff members under her charge paid to perform those tasks.

25. Indeed, Hoexter never asked the white directors to perform the same menial tasks she delegated to Plaintiff.

26. Similarly, when Plaintiff began requesting access to the College's Board of Trustees and access to the President so she could put her 2010 fundraising plan in place, she was repeatedly rebuffed by Hoexter and Sheridan.

27. Sheridan frequently acknowledged to Plaintiff he and Hoexter were interfering and preventing Plaintiff from doing her job. Sheridan even went so far as to instruct Plaintiff to "pretend" to do work and would often invite Plaintiff to watch college basketball games on his office computer during March Madness in the Spring of 2010.

28. Hoexter would not allow Plaintiff to meet with alumni, College trustees or other College donors – an essential function of the Director of Major Gifts – without any explanation. Upon information and belief, Sheridan and Hoexter did not interfere or thwart the efforts of the other white directors from doing their jobs.

29. Hoexter would not allow Plaintiff and her black office mate to shut their office doors just to eat lunch, while another white male office mate could close his office door for hours on end (regardless of whether he was in meetings or not).

30. Hoexter frequently embarrassed Plaintiff in front of the President and other colleagues. She falsely claimed Plaintiff had "outbursts" in the office; she criticized her clothing and implied that she was dressed unprofessionally and inappropriately (which was never the case); and she spoke to Plaintiff in "street slang," saying things such as "give me five" and raising her hand as if to slap hands together for a "high five."

31. Hoexter never spoke "slang" to white colleagues, never criticized other people's clothing (even though other staffers were truly dressed inappropriately) and

never disciplined or even chastised one white staff member who threatened to blow up Hoexter's office in 2010 rather than move to new office space with her.

32.  Upon information and belief, Hoexter fabricated stories about Plaintiff's behavior, clothes and spoke to Plaintiff in "slang" because Hoexter was pandering to racial stereotypes.

33.  Indeed, Hoexter told Plaintiff once that she assumed one of the College Trustee's daughters (a Hispanic) was on drugs. Hoexter never indicated the factual basis for the statement, and she never made such gross generalized statements about the white Trustees or their family members.

34.  Upon information and belief, Hoexter has made racial slurs and derogatory comments in writing about Plaintiff and other minority members of the John Jay staff, including about the President's Hispanic Chief of Staff.

35.  Throughout 2010 and early 2011, Plaintiff's job duties were changed by Hoexter and Sheridan no less than five (5) times. She was tasked with creating or managing annual giving, corporate giving and planned giving programs, areas in which she had no experience or expertise and each which area were already assigned to another director. Nevertheless, Plaintiff completed each and every project she was assigned on time or before deadline and as instructed.

36.  Moreover, Plaintiff during her employment was never informed that there were complaints about the quality of her work to such an extent that her job was in jeopardy. In fact, to the contrary, several of her projects for were highly regarded for fine quality and excellence by other directors and members of the President's staff.

Actually, upon information and belief, Hoexter and Sheridan passed Plaintiff's work off as their own.

37.     Further, Plaintiff was frequently expected to manage or take over special events, although there were two staff members on John Jay's pay roll who were paid to do just that – i.e. special event managers.  And usually, Plaintiff was asked to take over these "special events" with only a fraction of the time before the event was slated to begin.  Notably, none of the white directors were ever asked to do any job other than the one for which they were hired.

38.     Hoexter and Sheridan maligned Plaintiff's work product to the President, his Chief of Staff and other directors and heads of departments throughout the College, all the while, upon information and belief, passing off Plaintiff's work as their own.

39.     In fact, upon information and belief, Hoexter assigned the white staffer's work to Plaintiff; and just before she was terminated, Sheridan claimed to Plaintiff that she had more work in the Department than anyone else.  But Hoexter never instructed anyone to help or assist Plaintiff with her work.

40.     Plaintiff went to her Human Resources Department to notify College officials of the disparate, hostile and discriminatory treatment she was enduring at the hands of Hoexter and Sheridan on several occasions.  She met with the Director of Human Resources, Donald Gray, on three (3) occasions.

41.     Plaintiff met with Defendant Gray on June 3, 2010, August 18, 2010 and November 3, 2010 and described all of the foregoing.  She further explained that she felt that she was being set up to fail, treated worse than others based upon her race, gender and ethnic background.

42.     Moreover, Plaintiff described to Gray that her job description had changed frequently and was looking for guidance on how to proceed.  She provided him proof that she was performing her job plus any other tasks or projects assigned to her, even though there were individuals specifically paid by the College to perform those tasks or projects.  Upon presentation of Plaintiff's proof, he stated there must be "some other reason" for Hoexter and Sheridan's treatment of her.

43.     Gray responded that Plaintiff should file a grievance with the union and otherwise that he would "pray for her."  Plaintiff filed a formal complaint with the College through her union representative.

44.     Thereafter, Plaintiff saw Gray in their local supermarket.  She had emailed Gray and she told him the extreme toll the hostile work environment was taking on her health.  Gray stated he received the e-mail but had not read it, but indicated he would investigate her complaints.  Upon information and belief, Gray never followed through at all.

45.     Worse yet, upon further information and belief, instead of redressing Plaintiff's grievances, Gray merely contacted Hoexter and Sheridan and relayed all of the information Plaintiff shared with him each time he met with her, causing Hoexter (and the work environment) to become even more hostile for Plaintiff.

46.     Hoexter used Plaintiff's meetings with Gray to retaliate against Plaintiff.  Hoexter told Plaintiff in front of Sheridan to the effect that Hoexter heard Plaintiff had been complaining and now she would give Plaintiff so much work that Plaintiff would not have any time to complain.

47. Upon information and belief, when another white female colleague had complained about Hoexter to Gray, Hoexter had no knowledge of the complaint and Gray made no inappropriate comments to the woman (such as he would "pray" for her), but rather actually did his job and helped the woman and investigated her claims. Upon information and belief, in the white woman's case, Gray inquired and investigated the woman's allegations and Hoexter's competence and job performance.

48. Upon information and belief, Gray failed to conduct any kind of investigation into Plaintiff's complaints even though she presented him with proof that she had been performing her job tasks on time and as directed.

49. Further, Gray never provided the assistance to Plaintiff he promised he would both in formal meetings and impromptu (i.e. the supermarket). As Director of Human Resources, he was fully aware of the disparate and hostile treatment Plaintiff was suffering at the hands of Hoexter and Sheridan and even suggested to Plaintiff, "There must be another reason." Yet he did nothing to prevent the hostile work environment and discriminatory treatment from continuing to take place for months afterwards.

50. Upon information and belief, Defendant Gray's failure to intervene after several meetings with Plaintiff, coupled with his divulgence of information to Hoexter and Sheridan shows active participation in the discriminatory treatment of the Plaintiff, or at a minimum, aiding and abetting of the disparate and unlawful treatment described herein.

51. In addition, until February 2011, Plaintiff always had favorable, performance evaluations. In fact, upon information and belief, Hoexter and Sheridan manufactured the final performance evaluation to justify their decision to fire Plaintiff.

52. Then on or about February 25, 2011, Plaintiff was informed that her employment with John Jay was terminated.

53. Despite all of the foregoing, Plaintiff still raised more money than any other fundraising professional employed by John Jay College during the time she was employed there.

## PROCEDURAL REQUIREMENTS

54. Plaintiff has satisfied all procedural requirements prior to commencing this action.

55. On or about May 23, 2011, Plaintiff filed a Charge of Employment Discrimination with the New York State Division of Human Rights ("Division") which was duly filed with the United States Equal Employment Opportunity Commission ("EEOC"), a true copy of which is attached hereto and incorporated herein as **Exhibit A.** Plaintiff was asked to supplement her response to the EEOC, a true copy of that supplemental response is attached hereto and incorporated herein as **Exhibit B.**

56. Plaintiff received a Right to Sue Letter from the EEOC on or about November 18, 2011, a true copy of which is attached hereto and incorporated herein as **Exhibit C.**

57. Plaintiff commenced this action, *pro se*, within ninety (90) days thereof, or on February 17, 2012 by the filing of a Summons and Complaint. *See* Docket No. 1.

58. By Order of this Court, Plaintiff is permitted to amend her Complaint by August 24, 2012.  *See* Docket No. 15.

59. Upon information and belief, Defendant John Jay College is an employer engaged in an industry that affects commerce and employs more than fifteen (15) employees.

60. Upon information and belief, Defendant John Jay College is a corporate entity and a "person" within the meaning of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. 2000e-(a).

## AS AND FOR A FIRST CAUSE OF ACTION
## (Title VII)

61. Plaintiff repeats and re-alleges paragraphs "1" through "60" of the Amended Complaint as if fully set forth herein.

62. Plaintiff, an African-American female, is a member of a protected class.  At all relevant times herein and during the entire tenure of her employment with the Defendant she was a fully satisfactory employee.

63. Plaintiff has suffered an adverse employment action at the hands of the Defendants *including but not limited to*: the discriminatory, disparate, and hostile treatment during her employment and then the termination of her employment on February 25, 2011.

64. The foregoing adverse employment action(s) took place under circumstances give rise to an inference of discrimination.

65. Defendants' disparate, discriminatory and hostile treatment of Plaintiff, including Plaintiff's discharge from employment on the basis of her race ethnicity and

gender, was in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq.

66. Defendants, their agents, servants and/or employees by their conduct herein intentionally, willfully and without justification, violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq.

67. As a proximate result of Defendants' unlawful discrimination against Plaintiff, Plaintiff has suffered and continues to suffer, substantial losses, including loss of past and future earnings, bonuses, pension, deferred compensation, health insurance and any other past and/or future lost employment benefits lost as a result of Defendants' wrongful and unlawful conduct.

68. As a further proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer impairment and damage to Plaintiff's good name and reputation.

69. As a further proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses in excess of the jurisdictional limits of this Court.

70. The conduct of the Defendants was outrageous and malicious was intended to injure Plaintiff and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
## (NYS EXEC LAW 296)

71. Plaintiff repeats and re-alleges paragraphs "1" through "70" of the Amended Complaint as if fully set forth herein.

72. Defendants' disparate, discriminatory and hostile treatment of Plaintiff, including Plaintiff's discharge from employment on the basis of her race, ethnicity and gender, was in violation of the New York State Human Rights Law, Executive Law §296(1)(a).

73. Defendants, their agents, servants and/or employees by their conduct herein intentionally, willfully and without justification, violated NY Exec. Law §296(1)(a).

74. As a proximate result of Defendants' unlawful discrimination against Plaintiff, Plaintiff has lost wages, benefits promotional opportunities and bonuses; has suffered mental anguish, emotional distress and loss of enjoyment of life; and has incurred incidental and consequential damages and expenses in excess of the jurisdictional limits of this Court.

75. As a further proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer impairment and damage to Plaintiff's good name and reputation.

76. The conduct of the Defendants was outrageous and malicious was intended to injure Plaintiff and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
## (42 U.S.C. §1981)

77. Plaintiff repeats and re-alleges paragraphs "1" through "76" of the Amended Complaint as if fully set forth herein.

78. Upon information and belief, Defendant has a practice and policy of discriminatory treatment against African-Americans in terms of discipline and promotion.

79. In fact, all of Plaintiff's requests to attend trainings and professional development events were denied; but her white colleagues' requests to attend trainings and development events were approved and paid for in full.

80. Based upon the foregoing, as well as Defendants' disparate, discriminatory and hostile treatment of Plaintiff, including Plaintiff's discharge from employment on the basis of her race, ethnicity and gender, was in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

81. Defendants, their agents, servants and/or employees by their conduct herein intentionally, willfully and without justification, violated 42 U.S.C. §1981.

82. As a proximate result of Defendants' unlawful discrimination against Plaintiff, Plaintiff has lost wages, benefits promotional opportunities and bonuses; has suffered mental anguish, emotional distress and loss of enjoyment of life; and has incurred incidental and consequential damages and expenses in excess of the jurisdictional limits of this Court.

83. As a further proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer impairment and damage to Plaintiff's good name and reputation.

84. The conduct of the Defendants was outrageous and malicious was intended to injure Plaintiff and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (NYC HRL LAW)

85. Plaintiff repeats and re-alleges paragraphs "1" through "85" of the Amended Complaint as if fully set forth herein.

86. Defendants disparate, discriminatory and hostile treatment of Plaintiff, including Plaintiff's discharge from employment on the basis of her race, ethnicity and gender, was in violation of the New York City Human Rights Law.

87. As a proximate result of Defendants' unlawful discrimination against Plaintiff, Plaintiff has lost wages, benefits promotional opportunities and bonuses; has suffered mental anguish, emotional distress and loss of enjoyment of life; and has incurred incidental and consequential damages and expenses in excess of the jurisdictional limits of this Court.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (BREACH OF CONTRACT)

88. Plaintiff repeats and re-alleges paragraphs "1" through "87" of the Amended Complaint as if fully set forth herein.

89. Plaintiff was a member of the College's union and filed a formal grievance through the Defendant's union procedures.

90. Following that administrative procedure, Plaintiff and Defendant negotiated an agreement whereby Defendant offered to pay Plaintiff approximately $60,000 of benefits and salary including four (4) months of salary, career coaching, the option to obtain COBRA health insurance and other benefits.

91. Plaintiff and Defendant, including specifically, Defendant Gray, participated in an administrative hearing at the CUNY corporate offices in November 2011 regarding Plaintiff's complaints of racial discrimination, hostile work environment and disparate treatment on the basis of race, ethnicity and gender.

92. Although the Defendant's rules and regulations require that a decision be rendered within 20 days from the conclusion of that hearing, no decision has been forthcoming to date. Plaintiff has had no contact from union officials regarding the status of her case.

93. Moreover, Defendant John Jay has failed to pay Plaintiff any amounts promised and has failed to even offer her COBRA in contravention of the law; therefore Defendant failed to perform its obligation under the terms of the agreement with Plaintiff as promised and is in material breach of its agreement with Plaintiff.

**WHEREFORE,** Plaintiff, Ngozi Okaro, demands judgment against Defendants City University of New York John Jay College, Vivien Hoexter, James Sheridan and Donald Gray, and its officers, employees, agents, and other persons acting in concert or participation with them on all Causes of Action of this Complaint, as follows:

- A.   An award requiring Defendant John Jay College to implement an affirmative action program with respect to the hiring and retention of African-Americans in an environment free from discrimination;

- B.   An award to Plaintiff of her back pay and lost benefits and bonuses, together with pre-judgment interest;

- C.   An award to Plaintiff of her front pay, future benefits, and bonuses, together with post-judgment interest;

- D.   An award to Plaintiff of any amount of lost or diminished Social Security benefits, or retirement or other contributions that would have been made by the Defendant and any expenses incurred for job searches or the like while unemployed;

- E.   An injunction ordering that Defendant cease and desist all discriminatory practices, policies and procedures;

- F.   An award of compensatory damages to Plaintiff in the amount of Five Million Dollars ($5,000,000) for past, present and future pain and suffering and other evocable losses;

G. An award of punitive damages to Plaintiff for the conduct exhibited by Defendants in an amount to be determined;

H. An award of Plaintiff's reasonable attorney's fees, costs, disbursements and associated expenses of this litigation, including expert and witness fees and deposition and other costs of suit;

I. Interest on all money amounts awarded above; and

J. Such other and further relief as the Court deems just and reasonable.

## DEMAND FOR JURY TRIAL

The plaintiff demands trial by jury on all claims.

Dated: August 24, 2012
Rochester, New York

**LAW OFFICE OF HEIDI W. FEINBERG**

By: ___s/Heidi W. Feinberg_____
Heidi W. Feinberg, Esq.
*Attorney for Plaintiff*
Times Square Building
45 Exchange Boulevard, Ste 623
Rochester, New York 14614
(585) 489-1343
hwf@heidifeinberg.com

TO: ERIC T. SCHNEIDERMAN

Attorney General of the State of New York
***Attorneys for Defendants***
CLEMENT J. COLUCCI
Assistant Attorney General
New York State Department of Law
120 Broadway
New York, New York 10271
(212) 416-8634
Clement.Colucci@ag.ny.gov

## **CERTIFICATE OF SERVICE**

     I hereby certify that the foregoing Amended Complaint and Jury Trial Demand was electronically served upon Clement J. Colucci, Esquire, Assistant Attorney General, New York State Department of Law, Attorney General of the State of New York, Attorneys for the Defendants, 120 Broadway, New York, New York 10271, through the SDNY CM/ECF electronic filing system.

Dated: August 24, 2012

                                                                             **s/ Heidi W. Feinberg**
                                                                             _____

                                                                             Heidi W. Feinberg, Esq.
                                                                             *Attorney for Plaintiff*
                                                                             Times Square Building
                                                                             45 Exchange Boulevard, Suite 623
                                                                             Rochester, New York 14614
                                                                             Telephone: (585) 489.1343
                                                                             E-mail: hwf@heidifeinberg.com